UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT SHEPARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01504-MJD-TWP |
| | ) | |
| WASTE MANAGEMENT OF INDIANA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. 34]. The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

**I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party, and draw all reasonable inferences in his favor." *Pack v. Middlebury Cmty. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021) (citing *McAllister v. Innovation Ventures*, 983 F.3d 963, 967 (7th Cir. 2020)).

> Summary judgment is a critical moment for a non-moving party. It must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018). Neither will the mere scintilla of evidence. *Grant*, 870 F.3d at 571.

*Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, "as it is not the court's job to 'scour the record in search of evidence to defeat a motion for summary judgment.'" *Hildreth v. Butler*, 960 F.3d 420, 429 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527 (2021) (quoting *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008)).

## II.  Material Facts

The material facts of record, viewed in the light most favorable to Plaintiff, as the non-moving party, are as follow.

Plaintiff Robert Shepard was hired by Defendant Waste Management of Indiana, Inc., in March 2013 to work as a truck technician in Waste Management's Muncie, Indiana, location. [Dkt. 34-2 at 16.] Shepard responded to an online advertisement placed by a staffing company and was originally hired as a temporary employee. *Id.* at 9. He became a permanent employee a few months later. He was 55 years old at the time. *Id.* at 16.

Shepard was told during his initial interview with Waste Management that the position required that he have a Commercial Drivers License ("CDL"), which Shepard had. [Dkt. 34-2 at 13.] Prior to that interview, Shepard's initial application for the position had been completed by an employee of the staffing agency, who asked Shepard questions over the phone and entered his answers into an online application. [Dkt. 40-1 at 1; Dkt. 34-2 at 49; Dkt. 34-2 at 16-18.] The application, which Shepard did not see, described the position as "Technician—with CDL." [Dkt. 34-3 at 12.] One of the "Qualifying Questions" on the application was the following: "If offered this position would you be able to obtain Class A or B commercial driver's license and valid medical certificate." [Dkt. 34-2 at 49.] Shepard's answer was correctly recorded as "Yes, I

2

already have a valid CDL." *Id.* The job posting for the position for which Shepard applied also stated that "[t]echnicians are expected to obtain a CDL license within 6 months of hire," and that one of the minimum qualifications for the position was "[v]alid Class A or B CDL or willingness to obtain one." [Dkt. 34-3 at 9, 10.]

There was one other truck technician at the Muncie location throughout Shepard's employment, Billy Green. Green was born in 1984 and had worked for Waste Management since September 2012. *Id.* Green and Shepard reported to the same supervisor, Gary Freeman, [Dkt. 40-1 at 2], and had the same job title and job description, [Dkt. 40-2 at 2, 7]. The job description included the following:

> **B. Certificates, Licenses, Registrations or Other Requirements**
>
> Required: Valid driver's license and must have a clean driving record.
> Preferred: Valid CDL and must have a clean driving record.
> If a CDL is a requirement for a specific posting, an applicant must be 21 years of age.
> Must be at least 18 years of age
> Legally eligible to work in the United States.
> Ability to perform physical requirements of the position with or without reasonable accommodations.
> Successfully complete pre-employment drug screen, physical, and background check, which will include previous employment check, criminal history and motor vehicle record review.

[Dkt. 40-2.][1] In addition, the applicable collective bargaining agreement included only one "technician" job classification, which applied to both Shepard and Green. [Dkt. 40-1 at 2, 25].

A CDL was required for some of the job duties Shepard performed. For example, he occasionally would have to drive a truck to a driver whose truck had broken down on his route or

---

[1] Shepard asserts that "[t]he job description for both Shepard and Green indicated that a valid CDL was 'preferred' rather than required." [Dkt. 39 at 6.] However, the next line clearly contemplates that a "specific posting" for a position under this job description could require a CDL.

drive a truck back after it was repaired, and on rare occasions he took trucks out for road tests. *Id.* at 22.  Green did not have a CDL and therefore could not perform those job duties. [Dkt. 34-3 at 3.]  Green's initial application had included the following qualifying question:  "If offered this position would you be able to obtain Class A or B commercial driver's license and valid medical certificate within 6 months.  If required, would you be able to meet this requirement?" [Dkt. 34-3 at 6.]  Although Green responded in the affirmative, Waste Management did not require Green to obtain a CDL at any time during his employment.  *Id.* at 3, 4.

Prior to Shepard being hired, another technician who had a CDL, Bradley Hickman, worked at the Muncie location.  Hickman was employed by Waste Management from 2000 to December 2012.  [Dkt. 34-3 at 3.]  However, his last day at work was August 21, 2011, prior to Green being hired; after that, he was off work due to a back injury.  [Dkt. 40-3 at 1.]  Instead of requiring Green to obtain a CDL, once Hickman's employment officially ended, Waste Management decided to hire a new technician who had, or could obtain, a CDL.[2]  [Dkt. 34-3 at 4.]  That was the position for which Shepard was hired.

At some point during Shepard's tenure at Waste Management, Green was made lead technician.  As Shepard described it in his deposition, once that change was made,

> [Green] was responsible for running the shop, ordering, maintaining the shop as
> far as inventory and supplies and parts, and supposed to—he was supposed to

---

[2] Waste Management's Statement of Material Facts Not in Dispute contains the following statement:  "Because Hickman possessed [a CDL] and performed the duties requiring a CDL, Waste Management did not require Green to obtain a CDL when it hired him as a 'Technician' or expect him to obtain one during his employment."  [Dkt. 35 at 2.]  However, this fact is in dispute, as Shepard has presented the affidavit of Hickman that states that he never worked with Green because his last day at work was in August 2011.  [Dkt. 40-3 at 1.]  The evidence of record viewed in the light most favorable to Shepard establishes that Hickman was not available to perform the CDL duties when Green was hired or any time thereafter.

>schedule down trucks for [preventative maintenance] and things of that nature. . . . He had not very much of the other technician duties. I did most of that.

[Dkt. 45-1 at 7.][3]

In April 2019, Shepard underwent a routine medical examination that was required to retain his CDL. He reported that he had been prescribed hydrocodone by his physician. [Dkt. 34-2 at 25.] The medical examiner informed Shepard that he could not renew his medical certificate because taking hydrocodone, which is a narcotic, disqualified him from having a CDL. *Id.* at 26. Although Shephard's physician certified that he was capable of performing all of the job duties listed in the written job description provided to her by Waste Management—which did not explicitly include any duties that required a CDL—without accommodation, he was placed on unpaid medical leave. [Dkt. 40-1 at 2-3.]

In June 2019, Shepard met with Waste Management People Manager Beth Daniels, District Fleet Manager Don Williams, and District Manager II Eugene Billings. They informed Shepard that having a CDL was essential to his job and therefore he could not remain in his job unless he was able to retain his CDL.[4] [Dkt. 34-2 at 30.] Shepard was informed at the meeting

---

[3] The Court notes that Waste Management did not cite to this testimony in its initial brief. Pursuant to Local Rule 56-1(d), Shepard was entitled to file a surreply to address this evidence because it was cited for the first time in Waste Management's reply brief. Shepard did not avail himself of this opportunity.

[4] In Waste Management's Statement of Material Facts Not in Dispute, Waste Management states that Shepard "was reminded during this meeting that possessing a valid CDL was an essential job requirement." [Dkt. 35 at 4] Shephard vigorously disputes this characterization. While Shepard testified unequivocally at his deposition that he was told during his initial interview with Waste Management that a CDL was a requirement of the job, *see* [Dkt. 34-2 at 13-14, 40], in the affidavit he submitted in response to the instant motion, Shepard states the following:

- During my interview for the Technician job it was explained to me that having a CDL was a preferred qualification for Technicians, and that every Technician had to be willing and able to get a CDL, if Waste Management asked him to do so.

5

that he had the following options:  (1) stop taking the disqualifying medication so that he could retain his CDL and his position in Muncie; (2) transfer to a position with Waste Management in Indianapolis that did not require a CDL; or (3) termination.  *Id.* at 34.  Shepard asked them why they could not require Green, the other technician at the Muncie location, to obtain a CDL; they told him that Green had refused to do so and that it "would be unfair to ask him, after six years working there, to get a CDL."  *Id.* at 31.  Green also told Shepard that he was unwilling to obtain a CDL, and Shepard's union steward told Shepard that Green said he would quit if Waste Management required him to do so.  *Id.* at 32-33.

Stopping the medication was not an acceptable medical option for Shephard, [Dkt. 34-2 at 29], and he was unwilling to transfer to Indianapolis because it would require a much longer commute—nearly three hours round trip versus approximately fifty minutes.  [Dkt. 40-1 at 3.] While Waste Management offered him a pay increase of one dollar per hour if he transferred to

---

- It was also explained to me that Waste Management only needed one of the Technicians to maintain a CDL.
- It was not explained to me that I personally had to maintain a CDL while other Technicians were exempt.
- I was lead [sic] to believe, and understood, that 1) a CDL was a preferred qualification for the Technician job, 2) every Technician had to be willing to get a CDL and could be required to get a CDL, and 3) as long as one Technician had a CDL, Waste Management did not care to make any other Technicians get a CDL. . . .
- I . . . dispute that I applied for a CDL position or that anything was ever said to me prior to losing my CDL about it being my job duty to maintain a CDL.

[Dkt. 40-1.]  Shepard argues that "Waste Management suggests that Shepard's testimony is an admission that he understood that he personally was required to hold a CDL.  But that is a self-serving interpretation offered in the light most favorable to Waste Management.  It also happens to be inaccurate."  [Dkt. 39 at 10.]  Viewing the evidence of record in the light most favorable to Shepard, Shepard was told at his initial interview that having a CDL was a job requirement, but he did not understand that to mean that Green would not be required to obtain a CDL if Shepard was not able to maintain his.

6

Indianapolis, that would not have covered the cost of the additional commute. *Id* Shepard's employment with Waste Management was terminated as of August 26, 2019. [Dkt. 34-2 at 61.] Shepard filed a grievance with his union, which eventually was decided in Waste Management's favor. *Id.* at 49.

In advertising for Shepard's replacement, Waste Management made it clear that the position required that the applicant have a CDL or obtain one within ninety days of hire. [Dkt. 34-3 at 4, 26.] The employee Waste Management hired to replace Shephard was born in 1992. He obtained the required CDL after his hire. *Id.* at 4.

### III. Discussion

Shepard asserts that his termination violated the Age Discrimination in Employment Act ("ADEA"), which makes it unlawful to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C.A. § 623(a)(1). "At summary judgment, the critical question is whether the plaintiff has produced enough evidence to permit a reasonable factfinder to conclude that the plaintiff's [age] caused the adverse employment action. . . . To answer that question, we look at the evidence holistically." *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021) (citations omitted).

> In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action.'" *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir.), *reh'g denied* (July 31, 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in *Ortiz v. Werner Enters., Inc.* that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016).

*Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021).[5]

> The crux of Shephard's position is straightforward:
>
> Shepard and Green had identical titles, job descriptions, supervisors, job codes, and classifications under the applicable collective bargaining agreement. Yet Waste Management chose to fire Shepard under the guise that maintaining a CDL was an essential function of his job but not Green's. Green, who is nearly 30 years younger than Shepard, remains employed by Waste Management with no expectation that he ever obtain a CDL. Only after Green refused to obtain a CDL did Waste Management decide that holding a CDL was a job responsibility personal to Shepard.

[Dkt. 39 at 2.] He then argues that "'[a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.'" [Dkt. 39 at 4] (quoting *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019)).

There are two problems with this argument. First, the Seventh Circuit cases that contain the language quoted by Shepard do so in the context of the "similarly situated" prong of the *McDonnell Douglas* framework. In fact, the entire paragraph containing the quoted language reads as follows:

> "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). "Its purpose is to eliminate other possible explanatory variables, 'such as differing

---

[5] "Employing the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is one way that a plaintiff can assist the court in sifting through the evidence to assess whether discrimination under . . . the ADEA is established." *Chatman*, 5 F.4th at 746. However, "a plaintiff need not use the *McDonell Douglas* framework after *Ortiz*," *Igasaki*, 988 F.3d at 957, and Shepard does not invoke the *McDonnell Douglas* approach in his brief. Thus, the Court will consider only "'whether [Shephard] presented enough evidence to allow the jury to find in [his] favor.'" *Id.* at 958 (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)).

> roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Humphries*, 474 F.3d at 405).

*McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). As noted above, Shepard does not attempt to employ the *McDonnell Douglas* framework.[6] The Court notes, however, that once a plaintiff satisfies the similarly situated prong and the rest of the elements of his prima facie case under that framework, the defendant is given the opportunity to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Chatman*, 5 F.4th at 746.

> If the employer supplies a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. . . . In this context, pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). We have also referred to pretext as an employer's efforts to cover their tracks or hide their real reason for not hiring an applicant. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). Yet, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

*Id.* at 746-47. In other words, despite the out-of-context language quoted by Shepard, the inference he attempts to rely on is not necessarily sufficient to avoid summary judgment.[7]

---

[6] In its reply brief, Waste Management states that "Shepard has used the *McDonnell Douglas* framework to attempt to carry his burden," [Dkt. 46 at 3], but that is simply not the case. Although some of Shepard's arguments would be relevant to some of the elements of the *McDonnell Douglas* burden-shifting framework, he does not actually acknowledge those elements anywhere in his brief or attempt to fit his arguments into the framework.

[7] As Waste Management correctly notes, it has articulated a legitimate, non-discriminatory reason for Shepard's termination—the fact that he could not longer perform those parts of his job that required a CDL. While, again, Shephard does not mention *McDonnell Douglas*, he spends much of his brief essentially arguing that this reason is pretext. Those arguments are addressed above, as the evidence pointed to by Shepard in support of them are part of the single pile of evidence that the Court must evaluate as a whole.

However, the more fundamental problem with Shepard's argument is that all things simply were not equal between Green and Shepard at the time Shepard lost his CDL medical certification. Shepard himself testified that Green had—for about two years by that time—been acting as the "lead technician," performing distinct duties from those performed by Shepard. While Shepard emphasizes that there was only one technician position under the collective bargaining agreement and only one job description for technician, the reality of the situation, by Shepard's own admission, is that, regardless of the duties set forth in the written job description, Shepard and Green did not actually perform the same job duties and Shepard's job, as it was actually performed, required a CDL. In other words, the undisputed evidence of record establishes the existence of one of the "possible explanatory variables"—"differing roles"—that means that Green and Shepard were not equal in all respects other than age. *McDaniel*, 940 F.3d at 368. Therefore, the inference that age discrimination was the reason why Shepard was terminated for not having a CDL, while Green was not, is not supported by the undisputed facts of record.[8]

---

[8] Indeed, the courts have repeatedly recognized, in a variety of contexts, the limited reliability of written job descriptions. *See Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006) ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."); *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 230 (7th Cir. 2017) (in determining whether two employees performed "equal work" in a case under the Equal Pay Act, the court "'look[s] to the actual job duties performed by each employee, not to his or her job description or title'") (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006)); *E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 346 (7th Cir. 1988) (noting in Title VII sex discrimination case that "identical or similar job titles can be deceiving because they do not reflect the actual duties underlying the title") (citations omitted).

The remaining evidence pointed to by Shepard, viewed as a whole, also does not help him. Shepard spends much of his brief disputing Waste Management's assertion that he was hired for a "Technician with CDL" position, while Green was not. He first points to the fact that the job description applicable to both employees stated that a valid CDL was "preferred," not required. However, as noted above, the description recognized that a CDL could be required for certain posted positions. Shepard also disputes that he was told when he was hired that only he was required to have a CDL; it was his understanding that either technician could be required to have or obtain one. Shepard argues:

> Waste Management had a job posting that said all Technicians need a CDL, a written job description for the Technicians that said a CDL was preferred but included no CDL tasks, and in practice it followed neither path. Rather, it walked some fuzzy, unwritten middle line where as long as somebody had a CDL everything worked.
>
> The fact that possessing a CDL was not Shepard's exclusive responsibility is further evident because Waste Management asked Green on his job application if he could obtain a CDL. (ECF 34-3 at 6) If Green's job was truly a non CDL position as Waste Management claims, then Waste Management had no reason to reserve the right to require applicants to that position to obtain a CDL or to ask, as a "Qualifying Question" whether Green was able to obtain a CDL. (*Id.*) Waste Management's actions contemporaneous to its hiring decision undermine Waste Management's claim that the Muncie facility had two distinct technician positions, one that required a CDL and one that did not. The more reasonable explanation for Waste Management indicating in a job posting that it could require Green to obtain a CDL and asking on his job application if he could do so, is that it only had one class of Technician, any or all of whom could be required to obtain a CDL. Either way, resolution of a dispute requiring the weighing of competing evidence is inappropriate at a summary judgment stage.

[Dkt. 39 at 7-8.] Shepard further argues:

> At the time Green was hired, it had been more than a year since Hickman, who had a CDL, had last worked. (ECF 40-3 at 1) There is no evidence that Waste Management employed any other Technician, CDL holder or otherwise, at its Muncie facility when it hired Green. The story that Waste Management is trying to sell at summary judgment is that Green held a job that did not require a CDL while Shepard held a job that did require a CDL. The truth is Waste Management

11

> preferred that someone held a CDL but, in practice, did not consistently employ a technician with a CDL at the Muncie facility. Waste Management's published job posting indicated that all Technicians were expected to obtain a CDL and both Shepard and Green had to indicate their ability to obtain a CDL. (ECF 34-3 at 9-10) The fact that Waste Management did not enforce its own written policy demonstrates that the company's true policy was somewhere in between the 'everyone must get a CDL' of the job posting and the 'CDL is preferred' shown on the individual Technicians' job descriptions.

[Dkt. 39 at 9.]

However, Waste Management's position is not that it could not have required Green to obtain a CDL as a condition of his employment. Rather, Waste Management's position is that it chose to hire another technician—Shepard[9]—who had or would obtain a CDL rather than requiring Green to obtain one, and then it later chose to terminate Shepard and hire another technician who had or would obtain a CDL rather than requiring Green to obtain one after Green stated he would quit if they did so. *See* [Dkt. 35 at 10-11] ("Waste Management had asked Green to obtain his CDL and Green had refused, stating he would quit if forced to obtain a CDL. Armed with this knowledge, Waste Management elected not to call the bluff of Green, a union employee with a longer tenure than Shepard."). That undoubtedly seems grossly unfair to Shepard,[10] but Shepard points to no evidence from which a reasonable factfinder could conclude that Waste Management made the decision to terminate him because of his age. He relies solely

---

[9] Indeed, as Waste Management notes, the fact that it hired Shepard when he was 55 years old "create[s] an inference of nondiscrimination." *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000) (citing *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir.1994) ("It seems rather suspect to claim that the company that hired [plaintiff] at age 47 'had suddenly developed an aversion to older people' two years later.").

[10] As the Seventh Circuit has "stated repeatedly, it is not our province to sit as a super-personnel department evaluating the wisdom of an employer's staffing decisions." *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 878 (7th Cir. 2014) (citations omitted); *see also Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("It is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable.").

on his argument that he and Green were equal in all material respects other than their age which, as discussed above, simply is not the case given the very different job duties they were, by Shepard's own account, performing at the time of Shepard's termination.

"A plaintiff suing under the ADEA 'must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'" *Sinha v. Bradley Univ.*, 995 F.3d 568, 573 (7th Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)). "He may survive summary judgment by presenting sufficient evidence 'to create a triable issue' on whether the decisionmaker had a discriminatory motivation for the adverse employment action." *Id.* (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010)). Shepard simply has not presented such evidence here. Accordingly, Waste Management is entitled to summary judgment.

## IV.  Conclusion

For the reasons set forth above, Waste Management's motion for summary judgment [Dkt. 34] is **GRANTED**.

SO ORDERED.

Dated:  18 OCT 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all ECF-registered counsel of record via email generated by the Court's ECF system.